## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. |
| v. | ) ) | **CLASS ACTION** |
| METALDYNE PERFORMANCE GROUP INC., GEORGE THANOPOULOS, KEVIN PENN, LOREN EASTON, MICHAEL FISCH, NICK BHAMBRI, WILLIAM JACKSON, JEFFREY STAFEIL and JOHN PEARSON SMITH, | ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of the public stockholders of Metaldyne Performance Group Inc. ("Metaldyne" or the "Company") against Metaldyne and its Board of Directors (the "Board" or the "Individual Defendants")

for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder and to enjoin the vote on a proposed transaction, pursuant to which Metaldyne will be acquired by American Axle & Manufacturing Holdings, Inc. ("American Axle"), through its wholly-owned subsidiary Alpha SPV I, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On November 3, 2016, Metaldyne issued a press release announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Metaldyne to American Axle.  Under the terms of the Merger Agreement, Metaldyne stockholders will receive $13.50 in cash and 0.5 shares of American Axle common stock with a value of $11.75 for each share of Metaldyne common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $1.6 billion.

3.      On December 19, 2016, Metaldyne and American Axle filed with the United States Securities and Exchange Commission ("SEC") a joint Registration Statement on Form S-4, which was subsequently amended on January 27, 2017 (the "Registration Statement") in connection with the Proposed Transaction.  The Registration Statement, which recommends that Metaldyne stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Metaldyne management's projections, utilized

by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in its financial analyses; (ii) the valuation analyses prepared by BofA Merrill Lynch in connection with the rendering of its fairness opinion; and (iii) material information concerning the background of the process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

4.      In short, unless remedied, Metaldyne's public stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this

District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Metaldyne is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Metaldyne.

9.      Defendant Metaldyne is a Delaware corporation with its principal executive offices located at One Towne Square, Suite 550, Southfield, Michigan. The Company produces complex metal-formed components for engine, transmission, driveline and suspension applications for the automotive, commercial and industrial markets.  Metaldyne's common stock is traded on the New York Stock Exchange under the ticker symbol "MPG."

10.     Defendant George Thanopoulos ("Thanopoulos") has been President and Chief Executive Officer ("CEO") of the Company since August 2014.

11.     Defendant Kevin Penn ("Penn") is Chairman of the Board and has been a director of the Company since June 2014.  Defendant Penn is also a Managing Director of American Securities LLC ("American Securities"), Metaldyne's largest stockholder.

12.     Defendant Loren Easton ("Easton") has been a director of the Company since June 2014.  Defendant Easton is also a Managing Director of American Securities.

13.     Defendant Michael Fisch ("Fisch") has been a director of the Company since August 2014.  Defendant Fisch is also the President and CEO of American Securities, which he co-founded in 1994.

14.     Defendant Nick Bhambri ("Bhambri") has been a director of the Company since August 2014.

15.     Defendant William Jackson ("Jackson") has been a director of the Company since August 2014.

16.     Defendant Jeffrey Stafeil ("Stafeil") has been a director of the Company since August 2014.

17.     Defendant John Pearson Smith ("Smith") has been a director of the Company since August 2014.

18.     Defendants Thanopoulos, Penn, Easton, Fisch, Bhambri, Jackson, Stafeil, and Smith are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

19.     American Axle is a Delaware corporation with its corporate headquarters located at One Dauch Drive, Detroit, Michigan 48211.  American Axle was founded in 1994 and is a global automotive manufacturer and supplier of driveline and drivetrain components and systems.  American Axle's common stock is traded on the New York Stock Exchange under the ticker symbol "AXL."

20.     Merger Sub is a Delaware corporation and a wholly-owned subsidiary of American Axle.

21.     American Securities, together with its affiliates, is the largest stockholder of Metaldyne, owning approximately 77% of Metaldyne common stock.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Metaldyne common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.     Plaintiff's claims are properly maintainable as a class action under Rule

23 of the Federal Rules of Civil Procedure.

24.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of October 31, 2016, there were 66,696,179 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Metaldyne or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

25.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

26.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of

this nature.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

29.     Metaldyne is a provider of highly-engineered lightweight components for use in powertrain and suspension applications for the global commercial and industrial vehicle markets. The Company was formed in 2014 from the merger of three leading metal-forming technology companies.   The combination gives Metaldyne a variety of expertise in casting, forging, powder metallurgy and advanced machining.

30.     The Company's recent financial results underscore its promising prospects.   For example, on May 5, 2016, Metaldyne issued a press release announcing its financial results for the first quarter of 2016.  For the quarter, the Company reported gross profit of $136.5 million, a 6% increase from the first quarter

of 2015.  Adjusted EBITDA was $137.7 million, compared to $132.6 million in the first quarter of 2015.  Adjusted free cash flow was $92.7 million, a $6.2 million increase from the first quarter of 2015.  Defendant Thanopoulos commented on the Company's favorable results for the quarter, stating:

> We are extremely pleased with our first quarter results. Expansion of our margins and continued strong EBITDA despite certain macro headwinds show the strength in our business. Our solid cash flow gave us flexibility to increase our dividend, start our share repurchase program and build cash on the balance sheet. We are continuing to win new business and focus on fast growing powertrain applications. We are looking forward to a successful year in 2016.

31.    On August 4, 2016, the Company reported its second quarter 2016 financial results.  For the quarter, free cash flow was $24 million, a $13 million increase from the second quarter of 2015. The Company also reported net cash provided by operating activities of $66 million, compared to $65 million in the second quarter of 2015.

32.    On October 12, 2016, the Company announced plans to expand its operations in North Vernon, Indiana, with operations to begin in 2018.   The Company issued a press release stating:

> The Michigan-based company will invest $30.6 million to lease and equip a 32,400-square-foot facility in North Vernon. With construction scheduled to begin later this month and operations slated to begin in 2018, the new building will be adjacent to its current 130,000-square-foot facility in North Vernon. Connected by a breezeway, the two buildings will provide expanded space for the company to increase production of its powder forged connecting rods, which major

automobile manufacturers use to improve fuel-efficiency in their gasoline and diesel engines.

\* \* \*

"Our North Vernon manufacturing operations has been a strong performing plant for MPG and its customers for many years," said Doug Grimm, president and chief operating officer at MPG. "We are excited about this new expansion, and we appreciate the support from the state of Indiana."

33. The Company reported its third quarter financial results on November 3, 2016. Metaldyne announced that it booked $589 million of new business awards year to date, surpassing the original 2016 target of $400 million. The Company's free cash flows for the nine months ended October 2, 2016 were $51 million, compared to $43 million in the third quarter of 2015. Commenting on the results, defendant Thanopoulos stated:

We continue to deliver strong operating results and margins despite certain macro headwinds and the planned attrition of our non-core wheel bearing business. We attribute these results to our relentless focus on cost reductions. We also see continued momentum in our new business wins, centered on our core fuel efficient powertrain products with $589 million year to date. Our results and new business wins are aligned with our short and long-term value creation model.

**The Sale Process**

34. Communications between Metaldyne and American Axle began in late November 2015 when American Axle contacted defendant Penn to express American Axle's interest in a potential business combination with Metaldyne. Over

the next few months, Metaldyne and American Axle management continued to discuss a potential transaction between the two companies.

35.     On February 22, 2016, defendant Penn indicated to American Axle CEO David C. Dauch ("Dauch") that the Company would be unlikely to accept an acquisition below a range of $20.00 to $22.00 per share.

36.     In March 2016, defendant Thanopoulos visited a China-based automotive conglomerate, referred to in the Registration Statement as "Company A."

37.     On May 15, 2016, Dauch informed defendant Penn that American Axle might be willing to pay up to $21.00 per share for an acquisition of the Company and defendant Penn responded that Metaldyne's stock price had previously traded as high as $24.50 per share.

38.     Between December 2015 and June 2016, defendants Penn and Easton updated the Board regarding several unsolicited approaches that had been made to them in early 2016 by representatives of private equity sponsors and operating companies, however the Registration Statement fails to disclose the details of such approaches and whether the Company entered into any confidentiality agreements with such parties.

39.     On June 1, 2016, Metaldyne engaged BofA Merrill Lynch as its financial advisor in connection with a potential transaction involving the Company.

40.     On July 13, 2016, Company A expressed interest in exploring a potential investment or other strategic transaction with Metaldyne.

41.     Throughout June and July 2016, defendant Thanopoulos held periodic meetings with a significant customer of Metaldyne, referred to in the Registration Statement as "Company B," during which Company B sometimes expressed interest in potentially exploring a transaction with the Company. The Registration Statement fails to disclose whether Company A or Company B entered into a confidentiality agreement with Metaldyne, and if so, whether the agreement contains any standstill provisions which could still be in effect and operate to preclude Company A or Company B from making a topping bid for the Company.

42.     On July 15, 2016, American Axle submitted an initial offer to acquire Metaldyne for between $19.00 and $21.00 per share, comprised of approximately 55% cash and 45% shares of American Axle common stock. The initial offer also provided American Securities the right to nominate one member to the American Axle board of directors so long as it maintained a meaningful equity position in the combined company.

43.     On July 20, 2016, American Axle delivered a revised written offer to acquire Metaldyne for $20.00 per share, comprised of approximately 60% cash and 40% shares of American Axle common stock, with the remaining terms consistent with American Axle's initial offer.

44.    On July 29, 2016, American Axle delivered a second revised offer to acquire Metaldyne at a price between $20.00 and $21.00 per share, comprised of approximately 60% cash and 40% American Axle common stock.

45.    Between the end of July and late August 2016, BofA Merrill Lynch contacted sixteen other potential counterparties, including Company A and Company B, regarding a potential strategic transaction with Metaldyne.  Of the contacted parties, only Company A expressed interest in a potential transaction with the Company.  The Registration Statement fails to disclose whether the Company entered into any nondisclosure agreements with any of the contacted parties, and if so, whether such agreements contain any standstill provisions which preclude any of the parties from making a topping bid for the Company.

46.    On August 4, 2016, Company A delivered an all cash written offer to acquire all of the outstanding equity of Metaldyne that valued the Company at 5.5-6.0 times its last twelve month EBITDA, but did not specify a purchase price.

47.    On August 23, 2016, American Axle and Metaldyne entered into a mutual confidentiality agreement containing a two-year standstill restriction. American Securities also agreed to a one-year standstill provision with respect to American Axle.

48.    On August 30, 2016, Company A delivered a revised all cash offer to acquire Metaldyne at a price between $16.36 and $20.00 per share, or in the

alternative, to acquire a majority interest in Metaldyne with the expectation of subsequently consummating a series of follow-on transactions.

49.    On September 16, 2016, American Axle delivered a revised written offer to acquire Metaldyne for $21.25 per share, comprised of $12.63 to $13.34 per share of cash and the remainder in shares of American Axle common stock.

50.    On September 23, 2016, American Axle delivered its best and final offer to acquire the Company for $22.00 per share, comprised of approximately 61% cash and 39% shares of American Axle common stock.  The offer also provided American Securities the right to nominate three members of an enlarged eleven-member American Axle board following an acquisition.

51.    On October 13, 2016, Company A delivered to BofA Merrill Lynch a revised all cash offer to acquire the Company for a price in the range of $21.00 to $22.00 per share.  One week later, Company A delivered a revised offer reflecting a proposal in the range of $21.00 to $22.50 per share of Metaldyne common stock, the upper range of such offer being $0.50 ***above*** American Axle's best and final offer. Following discussion among the Board, management and the Company's advisors, the Board concluded it would proceed with discussions with American Axle, without asking for a best and final offer from Company A.

52.    From October 30, 2016 through the early morning of November 3, 2016, the parties and their advisors finalized the terms of the Merger Agreement.

On November 2, 2016, BofA Merrill Lynch delivered its fairness opinion to the

Board, and the next morning, the parties entered into the Merger Agreement.

**The Proposed Transaction**

53.     On November 3, 2016, the Company issued a press release announcing

the Proposed Transaction.  The press release stated, in relevant part:

> DETROIT, MI and SOUTHFIELD, MI, November 3, 2016 – American
> Axle & Manufacturing Holdings, Inc. (AAM), (NYSE: AXL) and
> Metaldyne Performance Group Inc. (MPG) (NYSE: MPG) today
> announced that the companies have entered into a definitive merger
> agreement under which AAM will acquire MPG for approximately $1.6
> billion in cash and stock, plus the assumption of $1.7 billion in net debt.
> The combination brings together highly complementary businesses and
> forms a premier, global Tier 1 supplier with broad capabilities across
> powertrain, drivetrain and driveline product lines, as well as diversified
> customer base and end-markets.
>
> Under the terms of the agreement, each share of MPG's common stock
> will be converted into the right to receive $13.50 per share in cash and
> 0.5 share of AAM common stock. Upon closing of the transaction,
> AAM's shareholders will own approximately 70% of the combined
> company and MPG's shareholders will own approximately 30%. The
> transaction has been unanimously approved by the boards of directors
> of both companies and is anticipated to close in the first half of 2017
> subject to shareholder and regulatory approval and other customary
> closing conditions.
>
> Concurrent with the signing of the merger agreement, AAM entered
> into a voting agreement with an affiliate of American Securities LLC,
> the controlling stockholder of MPG, pursuant to which American
> Securities LLC has agreed to vote in favor of and otherwise support the
> transaction, subject to the terms of the voting agreement. Following the
> transaction, an affiliate of American Securities LLC will own
> approximately 23% of the combined company.

"AAM's transformational acquisition of MPG brings together two complementary Tier 1 organizations to create a company with greater scale and increased diversity across products, customers and end markets," said David C. Dauch, AAM's Chairman and Chief Executive Officer. "MPG's expertise in complex, highly-engineered powertrain components and its global footprint will be tremendous assets to AAM. We are excited about the powerful industrial logic in this combination that will allow us to create additional value for our customers and other key stakeholders. Together, we are forming a company with increased earnings potential and enhanced cash flow generation that will allow us to rapidly reduce leverage while fueling growth and delivering value to our shareholders."

### Insiders' Interests in the Proposed Transaction

54. American Axle and Metaldyne insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Metaldyne.

55. Notably, defendant Thanopoulos has secured a position for himself with American Axle following completion of the Proposed Transaction. According to the November 3, 2016 press release announcing the Proposed Transaction, "[e]ffective as of the closing of this transaction, American Axle's board of directors will be expanded to 11 members with three designees of American Securities LLC joining American Axle's current board, including George Thanopoulos."

56. Moreover, Company insiders stand to reap substantial financial benefits for securing the deal with American Axle. Pursuant to the Merger Agreement, upon

consummation of the Proposed Transaction, Metaldyne's directors and officers will receive cash payments from the immediate vesting of all outstanding company stock options, restricted stock and restricted stock unit awards, as summarized in the following table:

| Name | MPG Stock Options | Consideration for MPG Stock Options(1) | Restricted MPG Common Stock | Consideration for Restricted MPG Common Stock(1) | MPG Restricted Stock Unit Awards | Consideration for MPG Restricted Stock Unit Awards(1) |
|---|---|---|---|---|---|---|
| *NEOs and Executive Officer* | | | | | | |
| George Thanopoulos | 401,113 | $ 4,479,496 | 103,208 | 2,270,576 | 127,374 | $ 2,802,228 |
| Doug Grimm | 592,760 | 2,217,713 | 78,232 | 1,721,104 | 91,973 | 2,023,413 |
| Mark Blaufuss | 146,586 | 1,367,508 | 63,248 | 1,391,456 | 91,973 | 2,023,413 |
| Russell Bradley | 73,178 | 749,712 | 1,168 | 25,696 | 17,384 | 382,455 |
| Gary Ford | 31,245 | 294,855 | 1,219 | 26,818 | 5,392 | 118,631 |
| Executive Officer | 18,519 | 114,633 | — | — | 9,488 | 208,736 |
| | | | | | | |
| *Directors* | | | | | | |
| Nick Bhambri | 4,409 | 64,563 | 882 | 19,404 | 3,135 | 68,970 |
| Loren Easton(2) | — | — | 1,763 | 38,793 | 3,135 | 68,970 |
| Michael Fisch(2) | — | — | 1,763 | 38,793 | 3,135 | 68,970 |

| Name | | | | | | |
|---|---|---|---|---|---|---|
| William Jackson | 4,635 | 71,729 | 882 | 19,404 | 3,135 | 68,970 |
| Kevin Penn(2) | — | — | 1,763 | 38,793 | 3,135 | 68,970 |
| Jack Smith | 4,635 | 71,729 | 882 | 19,404 | 3,135 | 68,970 |
| Jeffrey Stafeil | 4,326 | 64,397 | 882 | 19,404 | 3,135 | 68,970 |

57.     Further, if they are terminated in connection with the Proposed Transaction, Metaldyne's named executive officers are set to receive substantial cash severance payments.  Indeed, if defendant Thanopoulos is not retained by American Axle following consummation of the merger, he stands to receive over ***$10.86 million*** in golden parachute compensation.   The following table summarizes the cash amounts payable to the Company's named executive officers with respect to severance and equity awards, in connection with the Proposed Transaction:

| Name | Cash(1) | Equity(2) | Benefits(3) | Total |
|---|---|---|---|---|
| George Thanopoulos | $ 1,291,781 | $ 9,552,300 | $    20,880 | $ 10,864,961 |
| Douglas Grimm | 2,681,684 | 5,962,230 | 31,320 | 8,675,234 |
| Mark Blaufuss | 1,018,541 | 4,782,377 | 31,320 | 5,832,238 |
| Russell Bradley | 469,086 | 1,157,863 | 31,320 | 1,658,269 |
| Gary Ford | 554,247 | 440,305 | 31,320 | 1,025,872 |

**The Materially Incomplete and Misleading Registration Statement**

58.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.  As discussed below and elsewhere herein, the Registration Statement omits material information that must be disclosed to Metaldyne's stockholders to enable them to render an informed voting decision with respect to the Proposed Transaction.

59.     The Registration Statement omits material information with respect to (i) Metaldyne management's projections, that were made available to the Board, Metaldyne's financial advisor, BofA Merrill Lynch, in connection with the rendering of its fairness opinion, the American Axle board of directors and American Axle's financial advisor in connection with the merger; (ii) the valuation analyses prepared by BofA Merrill Lynch in connection with the rendering of its fairness opinion; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Metaldyne's stockholders.

**_Prospective Financial Information of Metaldyne and American Axle_**

60.     For example, the Registration Statement fails to disclose the financial projections provided by Metaldyne management and relied upon by BofA Merrill Lynch for purposes of its analyses, for fiscal years 2016-2020, for the following items: (a) net income; (b) earnings per share; (c) earnings before interest, taxes, depreciation, amortization and associated pension carrying costs calculated as the

net periodic benefit costs less service costs or "EBITDAP"; (d) adjusted EBITDAP; (e) free cash flow; (f) unlevered, after-tax free cash flow; and (g) a reconciliation of all GAAP to non-GAAP metrics.

61.     Additionally, the Registration Statement fails to disclose the financial projections provided by American Axle management and relied upon by BofA Merrill Lynch for purposes of its analyses, for fiscal years 2016-2020, for the following items: (a) net income; (b) earnings per share; (c) EBITDAP; (d) adjusted EBITDAP; (e) unlevered, after-tax free cash flow; and (f) a reconciliation of all GAAP to non-GAAP metrics.

62.     The omission of this information renders the following statements in the Registration Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 100 of the Registration Statement:

**Certain Unaudited Prospective Financial Information of MPG**

MPG does not as a matter of course make public long-term projections as to future revenue, earnings or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, MPG is including in this joint proxy statement/prospectus certain unaudited prospective financial information regarding MPG's anticipated future operations that was made available to the MPG board of directors, MPG's financial advisor, the AAM board of directors and AAM's financial advisor in connection with the merger. See also " —Opinion of MPG's Financial Advisor " beginning on page 86. The unaudited prospective financial information of MPG included below (which we refer to in this joint proxy statement/prospectus as the MPG forecasts) was prepared by MPG's

management as part of MPG's long-range plan for its business for fiscal years 2016 through 2020 and treats MPG on a standalone basis, without giving effect to the merger and as if the merger had not been contemplated by MPG. MPG uses certain non-GAAP financial measures as supplemental measures which MPG's management believes are useful to both management and its stockholders in their analysis of MPG's business and operating performance. MPG's management also uses this information for operational planning and decision-making purposes. Non-GAAP financial measures are not and should not be considered a substitute for any GAAP measure. Additionally, non-GAAP financial measures as presented by MPG may not be comparable to similarly titled measures reported by other companies. In the view of MPG's management, the MPG forecasts were prepared on a reasonable basis based on the information available to MPG's management at the time of their preparation. The MPG forecasts, however, are not facts and should not be relied upon as being indicative of actual future results, and readers of this joint proxy statement/prospectus are cautioned not to place undue, or any, reliance on this information. The inclusion of the MPG forecasts in this joint proxy statement/prospectus is not an admission or representation by MPG that such information is material. Actual results may differ materially from those contained in the MPG forecasts.

### *MPG forecasts*

| | Year Ended December 31,(1) | | | | |
|---|---|---|---|---|---|
| | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** |
| | *(in millions)* | | | | |
| Sales | $ 2,691 | $ 2,637 | $ 2,796 | $ 3,101 | $ 3,242 |
| Other expenses—stock based compensation | 18 | 20 | 20 | 20 | 20 |
| Adjusted EBITDA(2) | 493 | 504 | 550 | 617 | 650 |
| Depreciation and amortization | 216 | 232 | 247 | 262 | 275 |
| Changes in assets and liabilities | 13 | 11 | (10) | (20) | (9) |
| Capital expenditures | (209) | (229) | (217) | (197) | (194) |

(1)  MPG forecasts are pro forma to reflect MPG's exit from its wheel bearing (KBI) business and do not include the impact of MPG's

acquisition          of          Brillion          Iron          Works.

(2)   Adjusted EBITDA is a non-GAAP financial measure and was calculated as net income (loss) before interest expense, provision for (benefit from) income taxes and depreciation and amortization, with further adjustments to reflect the additions and eliminations of certain income statement items, including (i) gains and losses on foreign currency and fixed assets and debt transaction expenses, (ii) stock-based compensation and other non-cash charges, (iii) sponsor management fees and other income and expense items that MPG considers to be not indicative of its ongoing operations, (iv) specified non-recurring items, and (v) other adjustments.

(b)      From page 98 of the Registration Statement:

**Certain Unaudited Prospective Financial Information of AAM**

AAM does not as a matter of course make public long-term projections as to future revenue, earnings or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, AAM is including in this joint proxy statement/prospectus the AAM management forecasts, which consist of certain unaudited prospective financial information regarding AAM's anticipated future operations that was made available to the AAM board of directors, AAM's financial advisor, the MPG board of directors and MPG's financial advisor in connection with the merger. See also *"— Opinion of AAM's Financial Advisor* " beginning on page 79 and " —*Opinion of MPG's Financial Advisor* " beginning on page 86. The AAM management forecasts included below were prepared by AAM's management as part of AAM's long-range plan for its business for fiscal years 2016 through 2020 and treats AAM on a standalone basis, without giving effect to the merger and as if the merger had not been contemplated by AAM. AAM uses certain non-GAAP financial measures as supplemental measures which AAM's management believes are useful to both management and its stockholders in their analysis of AAM's business and operating performance. AAM's management also uses this information for operational planning and decision-making purposes. Non-GAAP financial measures are not and should not be considered a substitute for any GAAP measure. Additionally, non-GAAP financial measures as presented by AAM may not be comparable to similarly titled measures reported by other companies. In the view of AAM's management, the AAM forecasts were prepared on a reasonable basis based

on the information available to AAM's management at the time of their preparation.

### AAM forecasts

| | Year Ending December 31 | | | | |
|---|---|---|---|---|---|
| | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** |
| | *(in millions)* | | | | |
| Net sales | $ 3,953 | $ 4,247 | $ 4,331 | $ 4,454 | $ 4,443 |
| EBITDA(1) | 610 | 657 | 679 | 697 | 641 |
| EBIT(2) | 401 | 425 | 429 | 430 | 376 |
| Free cash flow(3) | 150 | 160 | 175 | 245 | 258 |

(1) EBITDA is a non-GAAP financial measure defined as earnings before interest expense, income taxes, depreciation and amortization.

(2) EBIT is a non-GAAP financial measure defined as earnings before interest expense and income taxes.

(3) Free cash flow is a non-GAAP financial measure AAM defines as net cash provided by operating activities less capital expenditures net of proceeds from the sale of property, plant and equipment and government grants.

### Summary of Material Financial Analyses of Metaldyne

63. With respect to the *Selected Publicly Traded Companies Analysis* conducted by BofA Merrill Lynch for Metaldyne, the Registration Statement fails to disclose the objective selection criteria and the individual multiples for each of the selected public companies analyzed by BofA Merrill Lynch, as well as any benchmarking analyses BofA Merrill Lynch performed for Metaldyne in relation to the selected public companies - for example, the history of Metaldyne's EBITDAP

multiples relative to those of the selected publicly traded companies considered by BofA Merrill Lynch in choosing the terminal multiples in its Discounted Cash Flow Analysis of Metaldyne.

64.     With respect to BofA Merrill Lynch's *Selected Precedent Transactions Analysis* for Metaldyne, the Registration Statement fails to disclose the individual multiples for each of the eighteen selected transactions involving companies in the automotive supplier industry since May 2012 analyzed by BofA Merrill Lynch.

65.     With respect to BofA Merrill Lynch's *Discounted Cash Flow Analysis* of Metaldyne, the Registration Statement fails to disclose: (i) how BofA Merrill Lynch derived the after-tax unlevered free cash flows from the Metaldyne; and (ii) the individual inputs and assumptions utilized by BofA Merrill Lynch to derive the discount rate range of 9.0% to 11.0%.

66.     The omission of this information enders the following statements in the Registration Statement false and/or materially misleading in contravention of the Exchange Act:

    (a)     from pages 90-92 of the Registration Statement:

> *Selected Publicly Traded Companies Analysis.*     BofA Merrill Lynch reviewed publicly available financial and stock market information for MPG and the following eleven selected publicly traded companies in the automotive supplier industry that BofA Merrill Lynch considered to have similar or reasonably comparable operations to MPG:

> American Axle & Manufacturing Holdings, Inc.

BorgWarner Inc.

Cooper-Standard Automotive Inc.

Dana Incorporated

GKN plc

Lear Corporation

Linamar Corporation

Magna International Inc.

Martinrea International Inc.

Tenneco Inc.

The Schaeffler Technologies AG & Co. KG

Publicly available information for Linamar Corporation, GKN plc, Martinrea International Inc. and The Schaeffler Technologies AG & Co. KG was adjusted to account for capitalized development cost as these companies report under IFRS accounting standards.

BofA Merrill Lynch reviewed, among other things, adjusted enterprise values of the selected publicly traded companies, calculated as equity values based on closing stock prices on November 1, 2016, plus debt, less cash, plus minority interests, less equity in unconsolidated affiliates, plus tax-effected pension and OPEB liabilities as a multiple of estimated earnings before interest, taxes, depreciation, amortization and associated pension carrying costs calculated as the net periodic benefit costs less service costs (which we refer to in this section of this joint proxy statement/prospectus as EBITDAP) for calendar years 2016 and 2017. The overall low, mean, median and high calendar year 2016 EBITDAP multiples observed for the selected publicly traded companies were 4.2x, 5.4x, 5.2x and 7.3x, respectively, and the overall low, mean, median and high calendar year 2017 EBITDAP multiples observed for the selected publicly traded

companies were 3.8x, 5.1x, 4.9x and 6.7x, respectively. The mean and median EBITDAP multiples exclude MPG and AAM. BofA Merrill Lynch then applied (i) calendar year 2016 EBITDAP multiples of 5.5x to 6.5x (derived from the selected publicly traded companies, based on information BofA Merrill Lynch obtained from public filings, publicly available research analyst reports and consensus estimates as published by FactSet Research Systems Inc.) to MPG's calendar year 2016 estimated EBITDAP, and (ii) calendar year 2017 EBITDAP multiples of 5.0x to 6.0x (derived from the selected publicly traded companies, based on information BofA Merrill Lynch obtained from public filings, publicly available research analyst reports and consensus estimates as published by FactSet Research Systems Inc.) to MPG's calendar year 2017 estimated EBITDAP. In both cases, at the direction of MPG, (A) BofA Merrill Lynch adjusted the estimated EBITDAP to exclude non-recurring items, underfunded pension expense and stock-based compensation, and (B) BofA Merrill Lynch assumed MPG's ongoing underfunded pension expense to be negligible.

**Implied Per Share Equity Value Reference Ranges for MPG**

| 2016E | 2017E | Implied Merger Consideration |
|---|---|---|
| $14.00 - $20.75 | $12.25 - $19.45 | $ 22.00 |

No company used in this analysis is identical or directly comparable to MPG. Accordingly, an evaluation of the results of this analysis is not entirely mathematical. Rather, this analysis involves complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the public trading or other values of the companies to which MPG was compared.

*Selected Precedent Transactions Analysis.*    BofA Merrill Lynch reviewed, to the extent publicly available, financial information relating to the following eighteen selected transactions involving companies in the automotive supplier industry since May 2012 that, in BofA Merrill Lynch's judgment, were relevant for its analysis based on the size, industry classification and relative performance of the target companies involved in such transactions:

| Acquiror | Target | Announcement Month and Year |
|---|---|---|
| Valeo SA | FTE Automotive GmbH | June 2016 |
| Musashi Seimitsu Industry Co., Ltd. | Hay Holding GmbH | May 2016 |
| The Riberas family | Gestamp Automoción, S.A. (35.0%) | February 2016 |
| Linamar Corporation | Montupet S.A. | October 2015 |
| Johnson Electric Holdings Limited | Stackpole International | August 2015 |
| BorgWarner Inc. | Remy International, Inc. | July 2015 |
| Magna International Inc. | GETRAG Group of Companies | July 2015 |
| Mahle GmbH | Delphi Automotive Plc. | February 2015 |
| Bain Capital, L.P. | TI Automotive Ltd. | January 2015 |
| ZF Friedrichshafen AG | TRW Automotive Holdings Corp. | September 2014 |
| Clearlake Capital Group | Sage Automotive Interiors, Inc. | September 2014 |
| Lear Corporation | Eagle Ottawa, LLC | August 2014 |
| Hitachi Metals Automotive Components USA, L LC | Waupaca Foundry, Inc. | August 2014 |
| AVIC Electromechanical Systems Co., Ltd. | Hilite International, Inc. | May 2014 |
| American Securities LLC | Grede Holdings LLC | April 2014 |
| American Securities LLC | MD Investors Corporation | December 2012 |
| American Securities LLC | HHI Group Holdings LLC | October 2012 |
| KPS Capital Partners LP | Waupaca Foundry, Inc. | May 2012 |

BofA Merrill Lynch reviewed transaction values, calculated as the enterprise value implied for the target company based on the consideration payable in the selected transaction, as a multiple of the

target company's twelve month estimated EBITDA. The overall low, mean and high twelve month revenue multiples observed for the selected transactions were 4.8x, 7.1x and 10.6x, respectively. BofA Merrill Lynch then applied twelve month adjusted EBITDA multiples of 5.5x to 7.0x (derived from the EBITDA multiple ranges of the selected transactions, based on BofA Merrill Lynch's professional judgment) to MPG's calendar year 2016 estimated adjusted EBITDA. In doing so, at the direction of MPG, BofA Merrill Lynch adjusted the estimated EBITDA to exclude non-recurring items and stock based compensation. Estimated financial data of the selected transactions were based on publicly available information at the time of announcement of the relevant transaction. Estimated financial data of MPG were based on the MPG forecasts. This analysis yielded the following approximate implied per share equity value
reference range for MPG, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Range for MPG | Implied Merger Consideration |
|:---:|:---:|
| $14.25 - $24.25 | $             22.00 |

No company, business or transaction used in this analysis is identical or directly comparable to MPG or the merger. Accordingly, an evaluation of the results of this analysis is not entirely mathematical. Rather, this analysis involves complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the acquisition or other values of the companies, business segments or transactions to which MPG and the merger were compared.

*Discounted Cash Flow Analysis.* BofA Merrill Lynch performed a discounted cash flow analysis of MPG to calculate the estimated present value of the standalone unlevered, after-tax free cash flows (at assumed effective tax rates, with the approval of MPG management, of 28.1% for the last four months of fiscal year 2016 and 28.5% for fiscal years 2017 through 2020) that MPG was forecasted to generate from September 1, 2016 to December 31, 2016 and during MPG's fiscal years 2017 through 2020, which unlevered, after-tax free cash flows were derived by BofA Merrill Lynch from the MPG forecasts to be approximately $81 million for the period from

September 1, 2016 to December 31, 2016 and approximately $207 million, $241 million, $307 million and $339 million for each of the fiscal years ending December 31, 2017 through 2020. BofA Merrill Lynch calculated terminal values for MPG by applying terminal forward multiples of 5.0x to 6.0x (which range of terminal forward multiples was selected taking into consideration, among other things, EBITDAP multiples for the selected publicly traded companies described above under " *Summary of Material Financial Analyses of MPG—Selected Publicly Traded Companies Analysis* " and BofA Merrill Lynch's professional judgment with respect to the history of MPG's EBITDAP multiples relative to those of the selected publicly traded companies) to MPG's fiscal year 2020 estimated adjusted EBITDAP (which BofA Merrill Lynch assumed, at the direction of MPG, to include stock-based compensation, but not other non-recurring items or pension expense, which pension expense BofA Merrill Lynch assumed to be negligible). The cash flows and terminal values were then discounted to present value as of August 31, 2016, reflecting BofA Merrill Lynch's assumption for purposes of this analysis that the cash flows would occur at the mid-point of a given year, and discount rates ranging from 9.0% to 11.0%, which reflect BofA Merrill Lynch's estimate of MPG's weighted average cost of capital, derived using the capital asset pricing model. This analysis yielded the following approximate implied per share equity value reference range for MPG, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Range for MPG | Implied Merger Consideration |
|---|---|
| $17.75 - $26.50 | $ 22.00 |

### Summary of Material Financial Analyses of American Axle

67.     With respect to the *Selected Publicly Traded Companies Analysis* conducted by BofA Merrill Lynch for American Axle, the Registration Statement fails to disclose the objective selection criteria and the individual multiples for each of the selected public companies analyzed by BofA Merrill Lynch, as well as any benchmarking analyses BofA Merrill Lynch performed for American Axle in

relation to the selected public companies - for example, the history of American Axle's EBITDAP multiples relative to those of the selected publicly traded companies considered by BofA Merrill Lynch in choosing the terminal multiples in its *Discounted Cash Flow Analysis* of American Axle.With respect to BofA Merrill Lynch's *Discounted Cash Flow Analysis* of American Axle, the Registration Statement fails to disclose: (i) how BofA Merrill Lynch derived the after-tax unlevered free cash flows for American Axle as well as the after-tax unlevered free cash flow figures for the last four months of fiscal 2016 through 2020; and (ii) the individual inputs and assumptions utilized by BofA Merrill Lynch to derive the discount rate range of 7.5% to 9.0%.

68.     The omission of this information renders the following statements in the Registration Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from pages 92-94 of the Registration Statement:

*Selected Publicly Traded Companies Analysis.*     BofA Merrill Lynch reviewed publicly available financial and stock market information for AAM and the following eleven selected publicly traded companies in the automotive supplier industry that BofA Merrill Lynch considered to have similar or reasonably comparable operations to AAM:

BorgWarner Inc.

Cooper-Standard Automotive Inc.

Dana Incorporated

GKN plc

Lear Corporation

Linamar Corporation

Magna International Inc.

Martinrea International Inc.

Metaldyne Performance Group Inc.

Tenneco Inc.

The Schaeffler Technologies AG & Co. KG

Publicly available information for Linamar Corporation, GKN plc, Martinrea International Inc. and The Schaeffler Technologies AG & Co. KG was adjusted to account for capitalized development costs as these companies report under IFRS accounting standards.

BofA Merrill Lynch reviewed, among other things, adjusted enterprise values of the selected publicly traded companies, calculated as equity values based on closing stock prices on November 1, 2016, plus debt, less cash, plus minority interests, less equity in unconsolidated affiliates, plus tax-effected pension and OPEB liabilities as a multiple of estimated EBITDAP for calendar years 2016 and 2017. The overall low, mean, median and high calendar year 2016 EBITDAP multiples observed for the selected publicly traded companies were 4.2x, 5.4x, 5.2x and 7.3x, respectively, and the overall low, mean, median and high calendar year 2017 EBITDAP multiples observed for the selected publicly traded companies were 3.8x, 5.1x, 4.9x and 6.7x, respectively. The mean and median EBITDAP multiples exclude MPG and AAM. BofA Merrill Lynch then applied (i) calendar year 2016 EBITDAP multiples of 4.5x to 5.5x (derived from the selected publicly traded companies, based on information BofA Merrill Lynch obtained from public filings, publicly available research analyst reports and consensus estimates as published by FactSet Research Systems Inc.) to AAM's calendar year 2016 estimated EBITDAP, and (ii) calendar year 2017 EBITDAP multiples of 4.0x to 5.0x (derived

from the selected publicly traded companies, based on information BofA Merrill Lynch obtained from public filings, publicly available research analyst reports and consensus estimates as published by FactSet Research Systems Inc.) to AAM's calendar year 2017 estimated EBITDAP. In both cases, at the direction of MPG, (A) BofA Merrill Lynch adjusted the estimated EBITDAP to exclude non-recurring items, underfunded pension expense and stock-based compensation, and (B) BofA Merrill Lynch assumed AAM's ongoing underfunded pension expense to be $6 million per annum. Estimated financial data of the selected publicly traded companies were based on publicly available research analysts' estimates, and estimated financial data of AAM were based on the AAM forecasts. This analysis yielded the following approximate implied per share equity value reference ranges for AAM as compared to the $17.06 per share closing price of AAM common stock on November 1, 2016:

**Implied Per Share Equity Value Reference Ranges for AAM**

| 2016E | 2017E | Closing Trading Price of AAM Common Stock on November 1, 2016 | |
|---|---|---|---|
| $19.25 - $27.25 | $17.75 - $26.25 | $ | 17.06 |

No company used in this analysis is identical or directly comparable to AAM. Accordingly, an evaluation of the results of this analysis is not entirely mathematical. Rather, this analysis involves complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the public trading or other values of the companies to which AAM was compared.

*Discounted Cash Flow Analysis.* BofA Merrill Lynch performed a discounted cash flow analysis of AAM to calculate the estimated present value of the standalone unlevered, after-tax free cash flows (at assumed effective tax rates, with the approval of AAM management, of 19.5% for the last four months of fiscal year 2016, 20.3% for fiscal year 2017, 19.1% for fiscal year 2018, 19.0% for fiscal year 2019, and 19.7% for fiscal year 2020) that AAM was forecasted

to generate from September 1, 2016 to December 31, 2016 and during AAM's fiscal years 2017 through 2020 based on the AAM forecasts. BofA Merrill Lynch calculated terminal values for AAM by applying terminal forward multiples of 4.5x to 5.5x (which range of terminal forward multiples was selected taking into consideration, among other things, EBITDAP multiples for the selected publicly traded companies described above under " *Summary of Material Financial Analyses of AAM—Selected Publicly Traded Companies Analysis* " and BofA Merrill Lynch's professional judgment with respect to the history of AAM's EBITDAP multiples relative to those of the selected publicly traded companies) to AAM's fiscal year 2020 estimated adjusted EBITDAP (which BofA Merrill Lynch assumed, at the direction of MPG, to include stock-based compensation, but not other non-recurring items or pension expense). The cash flows and terminal values were then discounted to present value as of August 31, 2016, reflecting BofA Merrill Lynch's assumption for purposes of this analysis that the cash flows would occur at the mid-point of a given year, and discount rates ranging from 7.5% to 9.0%, which reflect BofA Merrill Lynch's estimate of AAM's weighted average cost of capital, derived using the capital asset pricing model. This analysis yielded the following approximate implied per share equity value reference range for AAM, as compared to the closing price of AAM common stock on November 1, 2016:

| Implied Per Share Equity Value Reference Range for AAM | Closing Trading Price of AAM Common Stock on November 1, 2016 |
|---|---|
| $22.50 - $30.25 | $      17.06 |

## Material Omissions Concerning the Flawed Sale Process

69.    The Registration Statement also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction, including:

(a)    Whether the Company has entered into any confidentiality

33

agreements with any parties contacted by BofA Merrill Lynch, including Company A and Company B, that contain standstill provisions that would preclude these parties from making a topping bid for Metaldyne; and

(b)     The timing and nature of all communications regarding future employment or directorship of Metaldyne's officers and directors, including, but not limited to, defendant Thanopoulos, as well as who participated in all such discussions.

70.     Defendants' failure to provide Metaldyne stockholders with the foregoing material information renders the statements in the Registration Statement false and/or materially misleading and constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Registration Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting decision on the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

# CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

71.     Plaintiff repeats all previous allegations as if set forth in full.

72.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

73.     During the relevant period, defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

74.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by the defendants.  The Registration Statement misrepresented and/or

omitted material facts, including material information about the unfair sale process for the Company, the financial analyses performed by the Company's financial advisor, and the actual intrinsic standalone value of the Company. The defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

75.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

76.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

77.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

78.     Plaintiff repeats all previous allegations as if set forth in full.

79.     The Individual Defendants acted as controlling persons of Metaldyne within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Metaldyne and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

80.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

82.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

83.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

84.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Metaldyne, and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the

Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Genworth stockholders;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: February 16, 2017

                          **WEISSLAW LLP**


                          /s/ Richard A. Acocelli
                          Richard A. Acocelli
                          Michael A. Rogovin
                          Kelly C. Keenan
                          1500 Broadway, 16th Floor
                          New York, New York 10036
                          Tel: (212) 682-3025
                          Fax: (212) 682-3010

*and*

**MACWILLIAMS LAW PC**

/s/Sara K. MacWilliams (P67805)
Sara K. MacWilliams (P67805)
6663 Bloomfield Lane
West Bloomfield, MI 48322
Tel. (248) 514-5399


*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned certifies as follows:

1.      I have reviewed the complaint in this matter against Metaldyne Performance Group, Inc. ("MPG") and others and would authorize the filing thereof, if necessary.

2.      I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      I have been, at all relevant times stated in the complaint the holder of 100 shares of MPG common stock.

5.      I have not sought to serve or served as a class representative under the federal securities laws in the last three years, other than as listed below:

*In re QR Energy LP Unitholder Litigation*, Lead Case No. 4:14-cv-02195 (S.D.T.X.)

6.      I will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

_____
Stephen Bushansky